# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59208-8-II |
| Respondent, | Consolidated with |
| v. | |
| JEREMY LOUIS VILENDRE, | No. 60858-8-II |
| Appellant. | |
| In the Matter of the Personal Restraint of: | |
| JEREMY LOUIS VILENDRE, | UNPUBLISHED OPINION |
| Petitioner. | |

MAXA, P.J. – In this consolidated direct appeal and personal restraint petition (PRP), Jeremy Vilendre challenges his conviction of first degree child molestation. Vilendre's daughter LHV alleged that he molested her on a single occasion when she was 10 or 11 years old. LHV did not disclose Vilendre's abuse until approximately a year and a half later, when she told her former stepmother, her mother, her therapist, a forensic interviewer, and a doctor who performed a sexual assault examination. Vilendre denied that he molested LHV, and he tried to show that familial animosity between him and LHV's mother persuaded LHV to lie about the molestation.

In his direct appeal, Vilendre argues that (1) he received ineffective assistance of counsel because his defense counsel failed to object to alleged hearsay testimony from the witnesses to whom LHV disclosed the sexual abuse and failed to object to the doctor's testimony that delayed disclosure was normal; (2) the trial court erred by giving a no corroboration jury instruction, which stated that it is not necessary that the testimony of the alleged victim be corroborated to convict; (3) the trial court erred in denying his motion for arrest of judgment based on insufficient evidence that the alleged sexual abuse was for the purpose of sexual gratification; and (4) the trial court erred in denying his motion for a new trial based on juror misconduct.

In his PRP, Vilendre argues that he received ineffective assistance of counsel because (1) his defense counsel failed to call his current wife as a witness, and (2) his defense counsel failed to pursue evidence of alleged juror misconduct.

We hold that (1) all of Vilendre's ineffective assistance of counsel claims fail; (2) based on Supreme Court precedent, the trial court did not err by giving the no corroboration jury instruction; (3) the trial court did not err in denying the motion for arrest of judgment; and (4) the trial court did not err in denying the motion for a new trial.

Accordingly, we affirm Vilendre's conviction of first degree child molestation in his direct appeal, and we deny his PRP.

FACTS

*Background*

LHV is one of three children Vilendre and Andrea Corgill had together.[1]  Vilendre and Corgill divorced in 2016.  Vilendre then married Holley Bergfeld.  Vilendre and Bergfeld

---

[1] Corgill has another child with her current husband, who is LHV's half-sibling.

eventually divorced. Bergfeld remained close to Vilendre's children. Vilendre later married Michelle Vilendre.

On July 30, 2021, LHV told Bergfeld and Corgill that Vilendre had sexually abused her around January of 2020. Corgill reported the incident to child protective services and the police. LHV also told her therapist, Karen Veteran, that Vilendre had sexually abused her.

Deedee Pegler, a forensic interviewer, interviewed LHV. LHV disclosed to her that she had experienced sexual abuse. Dr. Kimberly Copeland, a child abuse pediatrician, conducted a sexual assault examination of LHV. LHV disclosed to her that Vilendre had sexually abused her.

The State charged Vilendre with one count of first degree child molestation.

*Motions in Limine*

The State moved in limine to admit evidence from Corgill, Bergfeld, Pegler, and Veteran about LHV's disclosure of Vilendre's alleged sexual abuse under the fact of complaint doctrine. Vilendre did not object, and the trial court granted the State's motion.

The State also moved to admit testimony from Dr. Copeland and therapist Veteran about LHV's disclosure of Vilendre's alleged abuse as hearsay admissible under the medical diagnosis hearsay exception in ER 803(a)(4). Vilendre objected, and the trial court reserved on ruling on the motion until trial and a potential offer of proof.

*LHV's Testimony*

LHV testified that she was around 10 or 11 years old when the incident with Vilendre happened. She testified that she did not know the exact date that it happened, but it was within a few weeks of her birthday in January 2020. LHV stated that during that time she would stay for one week at a time between Vilendre and her mother Corgill's house.

LHV testified that a few days before the sexual abuse she watched a horror movie at Bergfeld's house during a sleepover. A few days later at Vilendre's house she still was scared and asked for a nightlight in her room. Vilendre said that she could sleep in his room. LHV got into Vilendre's bed and fell asleep.

LHV stated that she woke up and felt Vilendre's hand on her chest. LHV testified that she felt one hand on the nipple of her right breast and that the hand was moving in circles around the whole breast. The touching was under her bra. Vilendre then grabbed and squeezed her buttocks over her clothing. Vilendre's touching lasted "[m]aybe seconds." Rep. of Proc. (RP) at 253. LHV stated that Vilendre then attempted to pull down her pants. LHV testified that Vilendre's breath smelled like beer and that he was slurring his words.

LHV left the bed and ran to the bathroom. She gave the following testimony:

Q So, once you were in the bathroom, how did you feel being in there?

A I felt like not real.

Q What do you mean by that?

A Like, I didn't want it to be real and I just felt like I didn't think that it was real.

Q But was it?

A Yeah.

RP at 255.

LHV later gave the following testimony:

Q Why didn't you tell anyone right away?

A I didn't even, like -- I didn't really believe myself.

Q What do you mean by that?

A Like, I felt like I just made it up or, like, it was, like, a nightmare or something.

Q And was it?

A No.

Q Is that something that you were trying to tell yourself?

A Yeah.

RP at 259.

In the summer of 2020, LHV tried to tell one of her friends about the incident. However, she ended up just telling him that she slept in Vilendre's bed one night. She also told an online friend about the incident, but she did not remember when.

LHV stated that in the summer of 2021, she disclosed to Bergfeld that Vilendre had touched her. She said that she told her mother the same night. LHV stated that she also told Veteran, her therapist, about the sexual abuse but did not remember what she told her. And she told Pegler, the forensic interviewer, about the sexual abuse.

*Corgill's Testimony*

Corgill, LHV's mother, testified that she and Bergfeld remained in touch and would see each other after Vilendre and Bergfeld separated. She stated that on July 30, 2021, she, Bergfeld, and LHV went out to get ice cream and cookies. Corgill gave the following testimony:

Q And so, at some point, without saying what was said, did [LHV] make a disclosure of sexual abuse to you?

A Yes.

RP at 320.

Corgill also testified that she would occasionally express her frustration about co-parenting with Vilendre to her children.

5

*Bergfeld's Testimony*

Bergfeld testified that after she separated from Vilendre she maintained a relationship with Corgill and LHV. LHV would visit Bergfeld after school. Bergfeld stated that around Christmas of 2019, she and LHV watched a scary movie.

Bergfeld testified that on the night that she, Corgill and LHV went out for ice cream, LHV asked to speak to her alone. Bergfeld gave the following testimony:

> Q  And without saying what she told you, did [LHV] make a disclosure of sexual abuse to you?
>
> A  Yes.

RP at 423. Bergfeld encouraged LHV to tell Corgill about the sexual abuse.

*Veteran's Testimony*

Veteran is LHV's therapist. She started seeing LHV in February 2021. Veteran testified that on August 2, 2021, she spoke on the phone with LHV. LHV told her that "there was a scary movie and she was invited to stay in Dad's bed and watch that and fell asleep, and that she had woken up and that he was touching her on her breasts and her buttocks." RP at 380-81. Veteran also testified that LHV stated that the alleged molestation occurred about 18 months earlier.

On cross-examination, Veteran acknowledged that LHV told her on August 2 that "she believe[d] her father was drunk or high and didn't know what he was doing." RP at 383. Veteran also recalled that Cargill called Vilendre a narcissist during a counseling session with LHV present. Veteran testified that LHV expressed to her in June 2021 that LHV "felt like she was put in the middle of the conflicts between her father on one side and her mom and ex-stepmom on the other." RP at 386.

*Pegler's Testimony*

Pegler is a forensic interviewer who interviewed LHV. She gave the following testimony:

Q Did [LHV] disclose sexual abuse to you?

A Yes.

RP at 354. Pegler also testified that delayed disclosure of sexual abuse was common for a number of reasons. She stated that LHV's delayed disclosure was common.

*Dr. Copeland's Testimony*

Dr. Copeland is a pediatrician who provides services "to evaluate children where there's concern of physical abuse, sexual abuse, or neglect." RP at 393. Before Dr. Copeland's testimony, Vilendre withdrew his objection from his motion in limine to exclude any testimony of medical hearsay from Dr. Copeland.

Dr. Copeland testified that the purpose of a sexual assault medical examination of a child is to understand what has happened to the child and to assess their overall wellbeing. She noted that "oftentimes if there's been one form of trauma there may be other forms of trauma." RP at 397. Dr. Copeland takes a history from the child to find out what has happened, and those questions are for the purpose of medical care. And she stated that the identity of the child's abuser is relevant to her examination.

Dr. Copeland testified that she examined LHV on August 30, 2021. During the exam, LHV told Dr. Copeland that Vilendre "groped" her. RP at 403. Dr. Copeland stated,

> She told me that it had been a one-time event about a year and a half prior to when I was seeing her, and she said that she woke up to her breasts being touched by his hands, and that this was on her skin, and that there was also an attempt made to remove her pants. And during that, she -- there was touching of her -- she called it her butt, both over the clothes and inside the clothes.

7

RP at 403. Dr. Copeland did not find any physical evidence during her examination of LHV.

The prosecutor asked Dr. Copeland about her experience with delayed disclosures:

Q Are you familiar with delayed disclosures?

A In – in my clinical experience, yes. It's not one of my areas of expertise beyond what I've noticed with kids.

Q Have you handled cases in your clinical experience where there have been delayed disclosures?

A Yes.

Q And in your experience, has that been common or uncommon?

A It's fairly common for a variety of reasons.

Q Are you aware of what some of those reasons are?

A The reasons I have experienced when kids tell me about it is they can have been scared to tell someone, they may have tried to tell someone in the past and nothing happened, so they didn't talk about it again for a long time. They may have had threats to them or to their pets or loved ones, is why they didn't tell. Sometimes they didn't think to tell when it was only about themselves, but then they became concerned about their siblings or someone else they knew could possibly have the same thing happen, and down the road that prompted them to tell something that they hadn't shared before.

Q Can delayed disclosures impact your medical findings?

A It can in the sense that you're obviously seeing someone further past when the event occurred, whether it be any one of those types of maltreatment, and so you're less likely to have physical findings the longer the time has passed.

RP at 399-400.

*Vilendre's Testimony*

Vilendre testified that there was animosity between him and Corgill after their divorce, and that he felt like Corgill "chose to have a friendship with [Bergfeld] over a healthy

8

coparenting relationship with me." RP at 516. He also stated that LHV had gotten angry when Vilendre took away her phone as punishment.

Vilendre testified that he had no memory of LHV being scared of a horror movie or afraid of the dark. He also stated that he did not remember letting LHV sleep in his bed and that although he drinks alcohol, he does not get drunk around his kids.

Vilendre denied that he ever touched LHV in an inappropriate way.

*Lee's Testimony*

Vilendre called as an expert witness Jeffrey Lee, Ph.D., a clinical psychologist with a certification in child forensic interviewing. Lee testified that a child's perception of what otherwise might be innocuous behavior by one parent can be influenced by the negative comments and disparagement of that parent by the other parent.

Lee also talked about delayed reporting of child sexual abuse. He testified that delayed disclosure can be common.

*No Corroboration Jury Instruction*

At trial, the State proposed a no corroboration jury instruction. Vilendre objected to the instruction, arguing that the Washington Pattern Jury Instructions recommend against using the instruction and that it improperly would encourage the jury to believe LHV. The trial court gave an instruction that stated, "In order to convict a person of the crime of Child Molestation in the First Degree as defined in these instructions, it is not necessary that the testimony of the alleged victim be corroborated. The jurors are the sole judges of credibility." Clerk's Papers (CP) at 210.

*Deliberations and Verdict*

During deliberations the jury submitted a question to the court. The trial court stated that the question was, "[W]hat happens if we deadlock? Are we able to take more time? What are the stipulations." RP at 672. The trial court was prepared to read a pattern instruction for when the jury is deadlocked, but then the jury informed the court that it had reached a verdict.

The jury found Vilendre guilty of first degree child molestation.

*Posttrial Motions*

Vilendre filed a motion for arrest of judgment based on CrR 7.4(a). He argued that there was insufficient evidence under CrR 7.4(a)(3) for a rational juror to find beyond a reasonable doubt that LHV was even awake or that he touched LHV for the purpose of sexual gratification.

Vilendre alternatively moved the trial court for a new trial under "CrR 7.5(a)(7)(8)." CP at 233. He attached a declaration from his defense counsel that stated,

> After trial, I spoke with the jurors. I learned that they were tied 5 to 6 to 1. I am unsure of whether it was 5 to acquit or 5 to acquit [sic],[2] but I know that 1 was undecided. I further learned that they promptly switched to 12 guilty upon the group collectively deciding that '[they] were here for [LHV].' I immediately made a written note of that statement.

CP at 234. Vilendre's counsel also attached a proposed juror questionnaire to address the verdict.

The trial court denied both motions.

*PRP Evidence*

In his PRP, Vilendre provides additional evidence through a declaration from his third wife, Michelle Vilendre.

---

[2] Defense counsel may have intended to write "5 to acquit or 5 to *convict*," or "5 to *convict* or 5 to acquit."

First, the declaration attaches an email from Vilendre to his defense counsel in the trial court. In the email, Vilendre asks his attorney if he would include in the materials reviewed by Dr. Lee, an email from Bergfeld's lawyer, LHV's messages over the messaging platform Discord, and a journal entry by LHV.

Second, the declaration attaches screenshots of text and Discord messages. One message is a text message from Michelle[3] to LHV in August 2021. In the message, Michelle states that they miss LHV and will comply with an ongoing child protective services investigation. Another set of messages is from the messaging platform Discord that Michelle claims were taken from LHV's account. The Discord message shows a screenshot of Michelle's text message, along with a message: "My mom it [sic] in the process of getting full custody and my dads fiance texted me this she thinks im hurt." Opening Br. of Pet'r, App. A, Ex. 2 at 3. A subsequent message thread with an unknown person ends with LHV stating, "They dont even know why this is happening" and that she wanted to live with her mother. Opening Br. of Pet'r, App. A, Ex. 2 at 3.

Michelle states in her declaration that the Discord conversation was frequently discussed with defense counsel. After the trial, Michelle asked defense counsel why he did not introduce the Discord conversation. Michelle claims that defense counsel admitted to her that he made an error.

Michelle also states in her declaration that shortly before LHV disclosed the alleged abuse, LHV admitted that her mother was saying bad things about Vilendre and wanted LHV to

---

[3] We refer to Michelle Vilendre by her first name to distinguish her from her husband. No disrespect is intended.

think bad things about Vilendre. LHV then told Michelle that she hated Bergfeld. LHV then hugged both Vilendre and Michelle and said she loved them.

Michelle states that she expected to be called as a witness at trial, and she does not know why defense counsel did not call her. She stated, "I don't recall him giving a specific reason other than he didn't think it was needed." Opening Br. of Pet'r, App. A at 6.

Vilendre appeals his conviction for first degree child molestation and seeks relief from that conviction through a PRP.

## ANALYSIS

### A.    INEFFECTIVE ASSISTANCE OF COUNSEL

Vilendre argues that he received ineffective assistance of counsel because defense counsel failed to object to (1) testimony that he claims was hearsay from various witnesses about LHV's disclosures of sexual abuse to them, (2) testimony that he claims was hearsay from Dr. Copeland about what LHV told her during Dr. Copeland's medical examination, and (3) Dr. Copeland's testimony about delayed disclosure of child sexual abuse. We disagree.

#### 1.    Legal Principles

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee criminal defendants the right to effective assistance of counsel. *State v. Bertrand*, 3 Wn.3d 116, 128, 546 P.3d 1020 (2024). To prevail on an ineffective assistance of counsel claim, a defendant must show both that defense counsel's performance was deficient and that the deficient performance was prejudicial. *Id.*

Defense counsel's representation is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness. *State v. Vazquez*, 198 Wn.2d 239, 247-48, 494 P.3d 424 (2021). There is a strong presumption that defense counsel's performance was

reasonable. *Bertrand*, 3 Wn.3d at 128. To rebut that presumption, a defendant bears the burden of establishing the absence of any legitimate strategic or tactical reason explaining counsel's conduct. *Vazquez*, 198 Wn.2d at 248.

Whether and when to object typically is a strategic or tactical decision. *Id.* And a legitimate trial strategy is to forgo an objection when defense counsel wishes to avoid highlighting certain evidence. *Id.* In addition, to establish deficient performance based on a failure to object, a defendant must show that the trial court would have sustained the objection. *Id.*

Prejudice exists if there is a reasonable probability that the result of the trial would have been different but for defense counsel's deficient performance. *Bertrand*, 3 Wn.3d at 129. This standard is lower than the preponderance of the evidence standard. *Id.* But the defendant must show more than that a different outcome is conceivable. *Id.*

2.  Testimony Regarding LHV's Disclosures

Vilendre argues that his defense counsel was ineffective for failing to object to testimony from Bergfeld, Corgill, Pegler, and Veteran regarding LHV's disclosures to them. He argues that the testimony was hearsay and the fact of complaint doctrine – based on which the State offered the testimony – is inapplicable because of the delay between the alleged molestation and the disclosures. The State concedes that the testimony was not admissible under the fact of complaint doctrine,[4] but argues that Vilendre's ineffective assistance of counsel claim fails

---

[4] Under the fact of complaint doctrine, "the State may present evidence that the victim reported the sexual violence to someone as part of its case in chief." *State v. Ortiz Martinez*, 196 Wn.2d 605, 611, 476 P.3d 189 (2020). But the doctrine applies only if the complaint was timely made. *Id.* at 614. Because the State concedes that LHV's complaint was not timely made, we do not address this issue.

13

because the testimony was not inadmissible hearsay, defense counsel had a strategic reason for failing to object, and Vilendre cannot show prejudice.

We conclude that even if the testimony of Bergfeld, Cargill, and Pegler regarding LHV's disclosures constituted hearsay, Vilendre cannot show prejudice because LHV testified that she made disclosures to those same people. The more detailed testimony of Veteran regarding what LHV told her constituted hearsay, but defense counsel may have had a strategic reason for not objecting and Vilendre cannot show prejudice.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Hearsay evidence generally is inadmissible. ER 802. But statements are not hearsay if they are not offered to prove the truth of the matter asserted. *State v. Chambers*, 134 Wn. App. 853, 859, 142 P.3d 668 (2006). We review de novo whether a statement constitutes hearsay. *State v. Carte*, 27 Wn. App. 2d 861, 877-78, 534 P.3d 378 (2023), *review denied*, 2 Wn.3d 1017 (2024).

Here, Bergfeld, Corgill, and Pegler did not testify about any specific out-of-court statements that LHV made to them. In fact, the prosecutor was careful not to ask these witnesses about what LHV told them. They simply answered "yes" when asked if LHV made a disclosure of sexual abuse. Arguably, the State introduced the testimony of these witnesses not to show what LHV said, but only to show the fact that LHV made disclosures of abuse.

However, even if this testimony constituted hearsay, Vilendre cannot show prejudice. LHV expressly testified without objection that she made disclosures to Bergfeld, Corgill, and Pegler that Vilendre had sexually abused her. Therefore, the brief testimony about those same disclosures merely was cumulative. Vilendre cannot show that this testimony made any difference in the outcome of the trial.

14

Veteran's testimony presents a different issue because she did testify about what LHV told her about the incident – that Vilendre touched her breasts and buttocks while she was sleeping in his bed. This testimony is hearsay.

However, there was a conceivable strategic reason for defense counsel to not object to Veteran's testimony. On cross-examination, defense counsel elicited that LHV told Veteran at the time of the disclosure that "she believe[d] her father was drunk or high and didn't know what he was doing." RP at 383. This testimony supported a defense argument that if Vilendre in fact touched LHV's breast, it was not done for sexual gratification.

In addition, LHV testified without objection that she told Veteran about the sexual abuse. And Veteran's testimony about the disclosure was very brief – LHV told her that she woke up and Vilendre "was touching her on her breasts and her buttocks." RP at 381. LHV testified at trial to the same facts that she told Veteran, only in much more detail. Therefore, Vilendre cannot show that Veteran's testimony made any difference in the outcome of the trial.

Accordingly, we hold that Vilendre's ineffective assistance of counsel claim based on the failure to object to the disclosure testimony of Bergfeld, Corgill, Pegler, and Veteran fails.

3. Dr. Copeland Testimony Regarding LHV's Disclosure

Vilendre argues that his defense counsel was ineffective by failing to object to Dr. Copeland's hearsay testimony about LHV's disclosure of abuse during her sexual assault medical examination. We disagree.

ER 803(a)(4) provides a hearsay exception for a statement "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." We consider the "subjective purposes of both

the declarant and the medical professional." *State v. Burke*, 196 Wn.2d 712, 740, 478 P.3d 1096 (2021). A statement is "reasonably pertinent" to diagnosis or treatment when the "declarant's motive in making the statement must be to promote treatment and the medical professional must have relied on it for purposes of treatment." *Id.* "Statements attributing fault are generally inadmissible under this exception, but statements 'disclosing the identity of a closely-related perpetrator' may be reasonably pertinent to treatment in certain situations like domestic violence or sexual abuse 'because part of reasonable treatment and therapy is to prevent recurrence and future injury.' " *Id.* at 740-41 (quoting *State v. Williams,* 137 Wn. App. 736, 746, 154 P.3d 322 (2007)).

Here, Dr. Copeland's testimony regarding LHV's disclosure that Vilendre sexually abused her was hearsay because it was an out of court statement offered for the truth of the matter asserted: that Vilendre touched LHV. But LHV's statement was to a medical provider. Dr. Copeland testified that taking a history of the alleged sexual abuse is important because the purpose of a sexual assault medical examination of a child is to understand what has happened to the child and to assess their overall wellbeing. Dr. Copeland expressly stated that she takes a history from the child to find out what has happened, and that those questions are for the purpose of medical care. And she stated that the identity of the child's abuser is relevant to her examination.

Dr. Copeland's testimony about her examination supported a finding that LHV's disclosure of sexual abuse to her was for "purposes of medical diagnosis or treatment" under ER 803(a)(4). Based on this testimony and the principles stated in *Burke*, it is likely that the trial court would have ruled that ER 803(a)(4) applies here.

Vilendre raises a contrary argument, that the purpose of Dr. Copeland's examination was not medical treatment in that the alleged molestation occurred a year and a half earlier and briefly touching a breast and buttocks would not create the need for medical attention. However, Vilendre has the burden of showing that the trial court would have rejected application of ER 803(a)(4) and sustained an objection to Dr. Copeland's testimony. *See Vasquez*, 198 Wn.2d at 248. We conclude that Vilendre cannot meet this burden.

Accordingly, we hold that Vilendre's ineffective assistance of counsel claim based on the failure to object to Dr. Copeland's disclosure testimony fails.

4. Dr. Copeland's Testimony Regarding Delayed Disclosure

Vilendre argues that his defense counsel was ineffective by failing to object to Dr. Copeland's testimony regarding delayed disclosure of sexual abuse.[5] We disagree.

Dr. Copeland testified that in her experience, delayed disclosure by children of sexual abuse is common. She listed a number of reasons for delayed disclosure, including that the child may have been threatened.

But Vilendre attacked LHV's credibility based in part on her delayed disclosure. "Once a witness's credibility is in issue, evidence tending to corroborate the testimony may, in the trial court's discretion, be obtained from an expert witness." *State v. Petrich*, 101 Wn.2d 566, 575, 683 P.2d 173 (1984), *abrogated on other grounds by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988). The Supreme Court in *Petrich* affirmed the admission of an expert's opinion in a child sex abuse case that "delay in reporting is not unusual." *Petrich*, 101 Wn.2d at 576; *see also State v. Holland*, 77 Wn. App. 420, 427, 891 P.2d 49 (1995) ("An expert's opinion that it is not

---

[5] Vilendre's brief suggests that Dr. Copeland's testimony about delayed disclosure was outside of her area of expertise. But he does not cite any evidence rule or case regarding expert testimony. We decline to address this argument as a challenge to expert testimony.

17

uncommon for a sexual abuse victim to delay reporting the abuse is appropriate when, as here, the credibility of the victim has been put in issue."). Therefore, we conclude that Vilendre cannot show that any objection to this testimony would have been sustained.

In addition, it is worth noting that both Pegler and Lee, Vilendre's psychologist expert, testified without objection that delayed disclosure of child sexual abuse was common.

Vilendre argues that Dr. Copeland's testimony invited the jury to infer that LHV had been threatened. But Dr. Copeland's testimony regarding delayed disclosure did not mention LHV and in no way implied that LHV had been threatened.

Accordingly, we hold that Vilendre's ineffective assistance of counsel claim based on defense counsel's failure to object to Dr. Copeland's delayed disclosure testimony fails.

B.      NO CORROBORATION JURY INSTRUCTION

Vilendre argues that the trial court commented on the evidence in violation of article IV, section 16 of the Washington Constitution and violated his constitutional right to present a defense by giving a no corroboration jury instruction. Based on Supreme Court precedent, we disagree.

In *State v. Clayton*, 32 Wn.2d 571, 574, 202 P.2d 922 (1949), the Supreme Court held that a no corroboration instruction was not a comment on the evidence because under the law, "in cases of [child sex crimes], a defendant *may* be convicted upon such testimony alone, provided the jury should believe from the evidence, and should be satisfied beyond a reasonable doubt, that the defendant was guilty of the crime charged." Accordingly, an instruction that a victim's testimony alone is sufficient to convict a defendant was a correct statement of law. *See id.*

Court of Appeals cases repeatedly have upheld the use of a no corroboration instruction based on the holding in *Clayton*, while also expressing concern about the propriety of such an

18

instruction. *See, e.g.*, *State v. Rohleder*, 31 Wn. App. 2d 492, 500-01, 550 P.3d 1042, *review denied*, 3 Wn.3d 1029 (2024); *State v. Kovalenko*, 30 Wn. App. 2d 729, 746, 546 P.3d 514, *review denied*, 3 Wn.3d 1036 (2024); *State v. Zimmerman*, 130 Wn. App. 170, 182-83, 121 P.3d 1216 (2005). The Washington Supreme Court Committee on Jury Instructions recommends against using such an instruction. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 45.02 cmt., at 1004 (5th. ed 2021).

But we are bound to follow *Clayton* as long as it remains good law. And the Supreme Court denied review in the most recent cases upholding the no corroboration instruction. Accordingly, we hold that the trial court did not err when it gave the no corroboration jury instruction.

C.      MOTION FOR ARREST OF JUDGMENT

Vilendre argues that the trial court erred when it denied his motion for arrest of judgment. Vilendre argues that there was insufficient evidence to prove beyond a reasonable doubt that any sexual contact occurred or that the contact was for sexual gratification. We disagree.

1.      Standard of Review

CrR 7.4(a)(3) allows a defendant to move to arrest judgment for "insufficiency of the proof of a material element of the crime." When reviewing a trial court's decision on a motion for arrest of judgment, we engage in the same sufficiency inquiry as the trial court. *State v. Longshore*, 141 Wn.2d 414, 420-21, 5 P.3d 1256 (2000). "The evidence presented in a criminal trial is legally sufficient to support a guilty verdict if any rational trier of fact, viewing the evidence in a light most favorable to the state, could find the essential elements of the charged crime beyond a reasonable doubt." *Id.*

2.    Legal Principles

RCW 9A.44.083(1) states, "A person is guilty of child molestation in the first degree when the person has, or knowingly causes another person under the age of eighteen to have, sexual contact with another who is less than twelve years old and the perpetrator is at least thirty-six months older than the victim."  RCW 9A.44.010(13) defines "[s]exual contact" as "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party."  We look at the totality of the facts and circumstances present in determining whether the proof of sexual contact is satisfied.  *State v. Harstad*, 153 Wn. App. 10, 21, 218 P.3d 624 (2009).

" 'Contact is 'intimate' within the meaning of the statute if the conduct is of such a nature that a person of common intelligence could fairly be expected to know that, under the circumstances, the parts touched were intimate and therefore the touching was improper.' " *Id.* (quoting *State v. Jackson*, 145 Wn. App. 814, 819, 187 P.3d 321 (2008)).  "A jury may determine that 'parts of the body in close proximity to the primary erogenous areas' are intimate parts." *Harstad*, 153 Wn. App. at 21 (quoting *In re Welfare of Adams*, 24 Wn. App. 517, 521, 601 P.2d 995 (1979)).

3.    Analysis

A rational trier of fact could have found that Vilendre touched the sexual or intimate parts of LHV.  LHV stated that she fell asleep in Vilendre's bed with him, and that she felt his hands touch her breast under her bra and her buttocks over her clothing.  Vilendre contends that it was equivocal whether or not LHV was even awake.  And Vilendre denied touching LHV at all.  But that argument goes to the weight of the evidence and the credibility of witnesses, not the

evidence's sufficiency. Resolving reasonable inferences in favor of the State, a rational juror could conclude that Vilendre touched LHV's intimate parts.

Vilendre also argues that there was insufficient evidence to show that if Vilendre touched LHV that the touching was for sexual gratification. LHV testified that Vilendre touched her under her bra, squeezed her buttocks, and attempted to pull down her pants. And she stated that Vilendre touched the nipple of her right breast and that his hand was moving in circles around the whole breast. Viewing this evidence in the light most favorable to the State, a rational juror could conclude that Vilendre touched LHV for sexual gratification or desire.

Accordingly, we hold that the trial court did not err in denying Vilendre's motion to arrest judgment.

D.     MOTION FOR NEW TRIAL – JUROR MISCONDUCT

Vilendre argues that the trial court erred in denying his motion for a new trial due to juror misconduct. We disagree.

1.     Legal Principles

CrR 7.5(a) states that a trial court may grant a new trial for certain reasons "when it affirmatively appears that a substantial right of the defendant was materially affected." CrR 7.5(a)(7) permits a new trial when "the verdict or decision is contrary to law and the evidence." CrR 7.5(a)(8) permits a new trial when it affirmatively appears "[t]hat substantial justice has not been done. When the motion is based on matters outside the record, the facts shall be shown by affidavit."[6]

---

[6] Vilendre moved for a new trial in the trial court only under CrR 7.5(a)(7) and (8). Therefore, we do not address any other subsections of CrR 7.5.

We review a trial court's denial of a CrR 7.5 motion for an abuse of discretion. *State v. Mohamed*, 186 Wn.2d 235, 240-41, 375 P.3d 1068 (2016). A trial court abuses its discretion " 'only when no reasonable judge would have reached the same conclusion.' " *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006) (internal quotation marks omitted) (quoting *State v. Bourgeois*, 133 Wn.2d 389, 406, 945 P.2d 1120 (1997)).

2.    Analysis

The only basis for Vilendre's CrR 7.5 motion is a declaration from defense counsel stating that he spoke to the jurors after the trial. Defense counsel stated that he was told that the jury was undecided, but then they agreed to find Vilendre guilty because they were "here for [LHV]." CP at 234. Vilendre argues that this declaration reflects potential juror misconduct.

However, we do not consider allegations of jury misconduct that inhere in the verdict. *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 568, 397 P.3d 90 (2017). Matters inhere in the verdict if they are " 'facts linked to the juror's motive, intent, or belief, or describ[ing] their effect upon the jury' or facts that cannot be rebutted by other testimony without probing any juror's mental processes." *Id.* (internal quotation marks omitted) (quoting *Long v. Brusco Tug & Barge, Inc.*, 185 Wn.2d 127, 131, 368 P.3d 478 (2016)).

Here, defense counsel's declaration stating that the jurors found Vilendre guilty after deciding that "[they] were here for [LHV]" relates directly to the motive for the jury's verdict. Therefore, we conclude that the statement in the declaration inheres in the verdict and cannot be the basis for juror misconduct. *See Lui*, 188 Wn.2d at 568. Accordingly, we hold that the trial court did not abuse its discretion in denying Vilendre's motion for a new trial.

E.      CUMULATIVE ERROR

Vilendre argues that cumulative error warrants reversal of his conviction. Because we reject all of Vilendre's arguments in his direct appeal, we also reject his claim of cumulative error.

F.      PERSONAL RESTRAINT PETITION CLAIMS

In his PRP, Vilendre argues that he received ineffective assistance of counsel because (1) his attorney failed to present critical evidence at trial, and (2) his attorney failed to thoroughly investigate a potential juror misconduct claim. We disagree.

1.    PRP Principles

To prevail in a PRP, the petitioner must establish by a preponderance of the evidence (1) a constitutional error that resulted in actual and substantial prejudice or (2) a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice. *In re Pers. Restraint of Meredith*, 191 Wn.2d 300, 306, 422 P.3d 458 (2018). Establishing "actual and substantial prejudice" means more than merely showing the possibility of prejudice; the petitioner must establish that if the alleged error had not occurred, the outcome more likely than not would have been different. *In re Pers. Restraint of Meippen*, 193 Wn.2d 310, 315-16, 440 P.3d 978 (2019).

2.    Legal Principles

The legal principles for an ineffective assistance of counsel claim on direct appeal stated above are the same for a PRP. *See In re Pers. Restraint of Crace*, 174 Wn.2d 835, 842-44, 280 P.3d 1102 (2012). A petitioner who successfully demonstrates prejudice in an ineffective assistance of counsel claim necessarily has shown actual and substantial prejudice sufficient to obtain collateral relief. *State v. K.A.B.*, 14 Wn. App. 2d 677, 707-708, 475 P.3d 216 (2020).

3.    Failure to Present Critical Evidence

Vilendre argues that his defense counsel was ineffective because he failed to call Michelle Vilendre at trial to testify about (1) the Discord messages that LHV sent and (2) what LHV had told Michelle shortly before her disclosure about Corgill wanting LHV to think bad things about Vilendre and LHV hating Bergfeld.

"The courts have indicated that the decision to call or not to call a witness is for counsel to make." *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 735, 16 P.3d 1 (2001). "Generally the decision whether to call a particular witness is a matter for differences of opinion and therefore presumed to be a matter of legitimate trial tactics." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 742, 101 P.3d 1 (2004). Defense counsel must be given " 'wide latitude and flexibility' " in deciding " 'whether to put some witnesses on the stand and leave others off.' " *Stenson*, 142 Wn.2d at 735 (quoting *State v. Piche*, 71 Wn.2d 583, 590, 430 P.2d 522 (1967)). However, an attorney's strategic decision to not call a particular witness must be an informed and reasonable one based on an investigation of the case. *State v. Jones*, 183 Wn.2d 327, 340, 352 P.3d 776 (2015).

Here, there are conceivable strategic reasons why defense counsel decided not to call Michelle as a witness at trial. First, defense counsel may have thought that Michelle would not make a credible witness, either because she was biased as Vilendre's wife or for some other reason not disclosed in the record. Without knowing more information, we cannot second guess defense counsel's decision. *See Stenson*, 142 Wn.2d at 735.

Second, LHV's statements on Discord – even if admissible[7] – are ambiguous. LHV's statement suggesting that she was not hurting as a result of the disclosure of the molestation could mean that she was relieved that she finally was able to tell what Vilendre did to her. LHV's statement that "they don't even know why this is happening" could mean different things, including that Michelle did not know that Vilendre molested her. Defense counsel may have been concerned that if he introduced these statements, LHV would have the opportunity to provide an explanation of what they meant and that would be detrimental to Vilendre's case.[8]

Third, what LHV told Michelle about her mother's negativity toward Vilendre and LHV's feelings about Bergfeld was inadmissible hearsay. ER 801(c). Without being able to introduce those statements, defense counsel may have determined that Michelle's testimony would not be helpful.

We give defense counsel wide latitude in deciding what witnesses to call at trial. *Stenson*, 142 Wn.2d at 735. And there is no indication that defense counsel's decision was based on a failure to investigate. Michelle stated that defense counsel knew about the Discord messages and discussed having Michelle testify.

Accordingly, we hold that Vilendre's ineffective assistance of counsel claim based on the failure to present evidence fails.

4.    Failure to Investigate Alleged Juror Misconduct

Vilendre argues that his counsel was ineffective by failing to investigate potential juror misconduct and requests a reference hearing. We disagree.

---

[7] Certainly, LHV's statement that that she wanted to live with her mother was inadmissible hearsay.
[8] Michelle's statement that defense counsel told her that he made an error in not admitting the Discord messages is hearsay and cannot be considered. ER 801(c).

As discussed above, defense counsel pursued a claim of juror misconduct. Defense counsel spoke with jurors and was apprised of the potential deadlock and of juror statements that he believed prejudiced Vilendre. Defense counsel then filed a motion for a new trial informing the trial court of this information and proposing a questionnaire for the jury. This was the reasonable course of action for an attorney who thinks that juror misconduct may have played a role in the verdict.

Vilendre suggests that defense counsel should have done more to investigate and develop this claim. However, as we conclude above, the juror's statements to defense counsel inhered in the verdict and could not be the basis for a juror misconduct claim. Vilendre fails to show that additional investigation would have revealed juror statements that would not have inhered in the verdict. Therefore, he is unable to show that defense counsel's representation was deficient or that he was prejudiced by any deficient performance of defense counsel.

Accordingly, we hold that Vilendre's ineffective assistance of counsel claim based on the failure to investigate juror misconduct fails.

## CONCLUSION

We affirm Vilendre's conviction of first degree child molestation in his direct appeal, and we deny his PRP.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, P.J.

We concur:

LEE, J.

PRICE, J.